# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNION PACIFIC RAILROAD COMPANY, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 07-CV-0320-MJR ) |
| KANSAS CITY SOUTHERN RAILWAY COMPANY, and GATEWAY EASTERN RAILWAY COMPANY, | ) ) ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

**REAGAN, District Judge:**

### A. Introduction and Factual/Procedural Background

On April 26, 2007, Union Pacific Railroad Company (Union Pacific) filed a three-count complaint in this district court (Doc. 2). Union Pacific alleges that Kansas City Southern Railway Company (K.C. Southern) and Gateway Eastern Railway Company (Gateway Eastern) breached a 1993 contract by refusing to permit Union Pacific to use approximately two miles of trackage between points known as Q Tower and Willows Tower in East St. Louis, Illinois. Union Pacific seeks damages incurred from the alleged breach, a declaratory judgment determining that the 1993 Agreement is binding and remains in effect, and a permanent injunction prohibiting K.C. Southern and Gateway Eastern from further preventing Union Pacific's use of the trackage.

On October 29, 2007, Union Pacific moved for summary judgment on the issue of liability (Doc. 53). Defendants responded on December 17, 2007 (Docs. 63 & 64) and Union Pacific filed its reply on December 27, 2007 (Doc. 65). However, at the June 6, 2008 Final Pre-Trial

-1-

Conference, Defendants indicated that they had included new arguments in their trial brief regarding the necessity for the Surface Transportation Board's approval before any grant of trackage rights may take effect, pursuant to **49 U.S.C. § 11323** (*See* Docs. 74 & 76). As a result, the Court ultimately ordered the parties to brief the issue, and permitted Defendants to file "a fully briefed motion requesting any and all relief to which they believe they are entitled" in light of **§ 11323** (Doc. 81).

On June 27, 2008, Defendants filed a motion for summary judgment on damages (Doc. 82) and supplemented their previous responses to Union Pacific's motion. Union Pacific filed its responses in opposition on July 25, 2008 (Docs. 87–90). Defendants filed replies on August 11, 2008 (Docs. 91–92), and Union Pacific filed a sur-reply on August 18, 2008 (Doc. 96).

Having exhaustively reviewed the parties' filings and supporting exhibits, the Court hereby **DENIES** Union Pacific's motion for summary judgment on liability (Doc. 53) and **GRANTS** Defendants' motion for summary judgment on damages (Doc. 82).

### B. Legal Standards

Under **FEDERAL RULE OF CIVIL PROCEDURE 56**, summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." **FED. R. CIV. P. 56(c);** *Breneisen v. Motorola, Inc.***, 512 F.3d 972 (7th Cir. 2008) (citing** *Celotex Corp. V. Catrett***, 477 U.S. 317, 322-23 (1986);** *Kreig v. Seybold***, 481 F.3d 512, 516 (7th Cir. 2007)).** *Accord Levy v. Minnesota Life Ins. Co.***, 517 F.3d 519 (7th Cir. 2008).**

In ruling on a summary judgment motion, this Court must view the evidence and all inferences reasonably drawn from the evidence in the light most favorable to the non-moving party.

*TAS Distributing Co., Inc. v. Cummins Engine Co.*, 491 F.3d 625, 630 (7th Cir. 2007); *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007).

The Court also notes that the 1993 Agreement includes a choice of law provision, which states that it "shall be applied and interpreted in accordance with the laws of the state of Illinois." **Doc. 53, Exh. 2, ¶ 18.** Moreover, as a federal court exercising diversity jurisdiction, this Court applies federal law in resolving procedural and evidentiary issues, and Illinois law with respect to substantive law. *Bevolo v. Carter*, 447 F.3d 979, 982 (7th Cir. 2006) **(citing *Colip v. Clare*, 26 F.3d 712, 714 (7th Cir. 1994)).**

## C. Analysis

The contract at issue is a December 20, 1993 Agreement (the 1993 Agreement) between a number of railroad companies. Therein, Gateway Eastern and Gateway Western Railway Company, along with Southern Pacific Transportation Company (Southern Pacific), SPCSL Corp., St. Louis Southwestern Railway Company, and Denver and Rio Grande Western Railroad Company, resolved "certain outstanding differences among them." **Doc. 53, Exh. 2.** In doing so, the parties made various agreements between themselves to, among other things, permit usage of certain trackage, to maintain, construct, and rehabilitate certain trackage, and to dismiss various pending lawsuits.

One provision in the contract involved the section of track between Q Tower and Willows Tower in East St. Louis, Illinois. At the time of the 1993 Agreement, Conrail owned this trackage, and Southern Pacific had previously contracted to use the track. **Doc. 64-3, Exh. 2.** At some point in 1993, Gateway Eastern[1] entered into negotiations with Conrail to acquire the subject

---

[1] Gateway Eastern is a wholly owned subsidiary of K.C. Southern (*See* Docs. 2 &47).

trackage. With this in mind, the parties negotiated a provision at Paragraph 7 whereby Gateway Eastern agreed to "permit" Southern Pacific's "continued use" of the trackage in question for the purposes of interchange with Conrail, its successors, and assigns. **Doc. 53, Exh. 2, ¶ 7.** In early 1994, Gateway Eastern did acquire the trackage in question from Conrail. **Doc. 54-2, Exh. 1.**

At that time, Southern Pacific continued to run trains over the trackage for purposes of interchange with Conrail at the Rose Lake Yard in East St. Louis. In 1998, Union Pacific merged into Southern Pacific, which in turn changed its name to "Union Pacific Railroad Company" (Doc. 53, Exh. 5).[2] In 1999, the CSX Corporation (CSX) acquired certain of Conrail's assets, including the Rose Lake Yard. At some point thereafter, Southern Pacific stopped using the track.

In 2004, however, Union Pacific sought to run its trains on the subject trackage. K.C. Southern and Gateway Eastern refused this demand. Union Pacific now seeks to enforce the 1993 Agreement, which it alleges grants it the right to use the trackage in question for purposes of interchange with CSX at the Rose Lake Yard. Defendants contend that the 1993 Agreement did not contemplate such a broad grant of rights.

**1. Union Pacific's Motion for Summary Judgment on Liability**

The parties' disagreement does not arise from any issue of contract formation. Rather, their disagreement stems from their differing interpretations of the 1993 Agreement, and Paragraph 7 in particular. Union Pacific argues that, in Paragraph 7, Gateway Eastern

---

[2] In fact, all of the railroad companies involved in the 1993 Agreement ultimately merged with either Union Pacific or K.C. Southern. On October 10, 2001, Gateway Western merged into K.C. Southern (Docs. 2 & 47). The Denver and Rio Grande Western Railroad Company and SPCSL Corporation merged into Union Pacific on June 30, 1997 (Doc. 53, Exhs. 11 & 12). Finally, on September 30, 1997, the St. Louis Southwestern Railways Company, an affiliate of Southern Pacific, merged into SSW Merger Corporation, which merged into Union Pacific on the same date (Doc. 53, Exhs. 9 & 10).

unambiguously granted its predecessor the right to use the trackage. However, Defendants argue that Paragraph 7's use of the phrase "continued use" is ambiguous, which requires the Court to consider extrinsic evidence to determine the parties' intent. Consideration of such extrinsic evidence, Defendants assert, will show that any right Union Pacific and its predecessors may have had to use the trackage was derived from other agreements, which are no longer viable.

"Illinois adheres to a 'four corners rule' of contract interpretation." ***Davis v. G.N. Mortgage Corp.*, 396 F.3d 869, 878 (7th Cir. 2005).** This rule provides that the "extrinsic or parol evidence concerning a prior or contemporaneous agreement is not admissible to vary or contradict *a fully integrated writing*." ***Id.* (citations and quotations omitted) (emphasis in original).** As such, the Seventh Circuit has indicated that the threshold question when interpreting a contract is whether the contract is fully integrated.

Here, the parties do not address this particular issue. However, whether the contract is fully integrated makes no difference in this instance, because Defendants do not advocate that the agreement be interpreted to include additional, inconsistent, or different terms not present in the writing. Rather, the issue raised is whether the written terms of the agreement are ambiguous such that they may be interpreted in the manner Defendants propose. As such, it is clear that if there is ambiguity in the agreement, extrinsic evidence is admissible to resolve that ambiguity regardless of whether the contract is fully integrated. Stated another way, "even when a contract is integrated on its face, if the contract is ambiguous, as a matter of law, then extrinsic and parol evidence is admissible to explain the terms of the ambiguous contract." ***Id.* (quoting *Sunstream Jet Express, Inc. v. Int'l Air Serv. Co., Ltd.*, 734 F.2d 1258, 1265 (7th Cir. 1984)).**

Thus, the Court turns to the question of whether the parties' agreement is ambiguous.

The interpretation of a contract where no ambiguity exists is a matter of law for the Court to decide. *Air Safety, Inc. v. Teachers Realty Corp.*, **706 N.E.2d 882, 884 (Ill. 1999).** However, if the contract's language "is susceptible to more than one meaning, then an ambiguity is present . . . [and] parol evidence [may] be admitted to aid the trier of fact in resolving the ambiguity." *Id.* **(citations omitted).**

In determining whether the 1993 Agreement contains ambiguity, the parties clearly disagree as to the controlling legal standards in Illinois. Union Pacific argues that the Court must look only to the writing itself to determine whether an ambiguity exists and may only admit extrinsic evidence if it finds that the contract's terms are ambiguous. However, Defendants argue that Illinois law permits the Court to provisionally consider extrinsic evidence to determine whether an ambiguity exists in the first place.[3]

In fact, there has been confusion as to which approach Illinois courts apply in determining whether contract language is ambiguous. However, it is clear to this Court that extrinsic evidence is not provisionally admissible to determine whether a contract is ambiguous.

Traditionally, Illinois courts adhered to the "four corners rule," looking only to the language of the contract to determine whether ambiguity exists. *Air Safety*, **706 N.E.2d at 884.** Under this rule, extrinsic evidence is only admissible to explain the terms of the contract if the Court first finds a provision ambiguous. *Id.*

In the 1980s and 1990s, however, a number of appellate courts in Illinois departed

---

[3] Indeed, Defendants implore this Court to provisionally consider a wide variety of extrinsic evidence. Generally speaking, this evidence includes subsequent contracts to which neither Union Pacific nor Southern Pacific were parties, letters between Conrail and Southern Pacific, and documents concerning the nature of Southern Pacific's use of the trackage after 1993.

from the four corners rule and instead applied the "provisional admission approach." *See Meyer v. Marilyn Miglin, Inc.*, 652 N.E.2d 1233, 1238 (Ill.App.Ct. 1995) (adopting the provisional admission approach and collecting cases supporting that approach); *see also R.T. Hepworth Co. v. Dependable Ins. Co., Inc.*, 997 F.2d 315, 318 (7th Cir. 1993) (collecting cases and noting that "Illinois has largely rejected the traditional rule . . . ."). Under the provisional admission approach, a court may "provisionally consider extrinsic evidence to ascertain the definition of terms used by the parties in its effort to determine whether the contract is ambiguous." *Meyer*, 652 N.E.2d at 1238. If the trial judge finds no ambiguity, he must disregard the extrinsic evidence and interpret the contract according to its plain meaning. *Id.* However, if he does find ambiguity, extrinsic evidence may be admitted to assist the trier of fact in resolving the ambiguity. *Id.*

Recognizing the split of opinion among Illinois appellate courts, the Supreme Court of Illinois addressed the issue in *Air Safety*. The Court noted that it had "never formally adopted the provisional admission approach" and determined that extrinsic evidence is not provisionally admissible where the contract at issue contains an explicit integration clause.[4] *Air Safety*, 706 N.E.2d at 885. Importantly, the court included a footnote "expressly declin[ing] to rule on whether the provisional admission approach may be applied to interpret a contract which does not contain an integration clause until such a case is squarely before the court." *Id.* at 885 n.1.

Such a case apparently has yet to come before the Supreme Court of Illinois. Nonetheless, appellate courts in Illinois have followed the same reasoning in refusing to apply the

---

[4] An integration clause, also known as a merger clause, is "[a] contractual provision stating that the contract represents the parties' complete and final agreement and supersedes all informal understandings and oral agreements relating to the subject matter of the contract." **BLACK'S LAW DICTIONARY 1002 (7th Ed. 1999).**

provisional admission approach under other circumstances. For instance, in *Eichengreen*, the court noted the Supreme Court's decision in *Air Safety* and applied the four corners rule rather than the provisional admission approach where the contract was fully integrated, even though it lacked an explicit integration clause. *Eichengreen*, **757 N.E.2d at 957–58.** Likewise, the Seventh Circuit, applying Illinois law, refused to provisionally admit extrinsic evidence to determine ambiguity where the contract was fully integrated. *Davis*, **396 F.3d at 880.**

Most compelling, however, is the Appellate Court of Illinois's reasoning not to apply the provisional admission approach in *River's Edge Homeowners' Ass'n v. Naperville*, **819 N.E.2d 806 (Ill.App.Ct. 2004).** There, in interpreting an easement, the court weighed the viability of the four corners rule versus the provisional admission approach in light of *Air Safety*. *Id.* **at 809–11.** The court examined the merits of each approach, noting that "[t]he supreme court has not squarely addressed the validity of the provisional admission approach in Illinois." *Id.* **at 810.** Ultimately, the court determined that it was bound to apply the four corners rule:

> The supreme court's decision in *Armstrong Paint Works*, [133 N.E. 711 (Ill. 1921),] which declared the four corners rule, has never been reversed or modified. . . . The supreme court in *Air Safety* may have "suggested" that it would later adopt the provisional approach rule, . . . but suggestions and hints do not establish precedent. The holding in *Armstrong Paint Works* remains binding precedent upon this court. . . . Accordingly, we employ the four corners approach.

*Id.* **at 811.**

In light of the fact that the Supreme Court of Illinois has never sanctioned the use of the provisional admission approach, along with the appellate court's persuasive reasoning in *River's Edge*, the Court finds that Illinois law requires the application of the four corners rule.

The four corners rule requires that

-8-

> [a]n agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence.

*Air Safety*, **706 N.E.2d at 884.** Accordingly, a court may only admit extrinsic evidence "to show additional consistent terms of a contract [if] the writing is incomplete or ambiguous." *Eichengreen*, **757 N.E.2d at 956.** Language in a contract is ambiguous if it is unclear or susceptible to more than one meaning. *Gallagher v. Lenart*, **874 N.E.2d 43, 58 (Ill. 2007).** Additionally, "because words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others. The intent of the parties is not to be gathered from detached portions of a contract or from any clause or provision standing by itself." *Id.* **(citations omitted).**

> Paragraph 7 states as follows:
>
> [Gateway Eastern] shall permit [Southern Pacific's] continued use, without charge to [Southern Pacific], of trackage which [Gateway Eastern] will acquire from Conrail between "Q" Tower and Willows Tower for [Southern Pacific] interchange with Conrail, any tenant of Conrail, and Conrail's successors and assigns.

Union Pacific argues that in Paragraph 7, Gateway Eastern directly granted its predecessor, Southern Pacific, the right to use the trackage upon Gateway Eastern's acquisition of it. Defendants, on the other hand, argue that the words "permit . . . continued use" create ambiguity. According to Defendants, "To determine what 'continued use' Gateway Eastern had to 'permit,' the Court must determine Southern Pacific's use of the subject railroad track prior to and at the time of the creation of the 1993 Agreement." **Doc. 63, pp. 10–11.**

Defendants also argue that the language "permit . . . continued use" is ambiguous because it is internally inconsistent with other portions of the agreement. According to Defendants,

Paragraph 7 cannot constitute an independent grant of trackage rights, because elsewhere in the contract, the parties "grant" trackage rights to each other and use language expressly doing so. For example, in Paragraph 3, Gateway Western agrees that various parties "shall be granted trackage rights" over a particular section of track. **Doc. 53, Exh. 2, ¶ 3.** In other words, Defendants assert that had the parties intended for an independent grant of trackage rights in Paragraph 7, the agreement would have used the verb "grant."

Finally, Defendants argue that contracts granting trackage rights are by necessity detailed agreements, extensively providing the rights and responsibilities of the parties. Paragraph 7, on the other hand, is merely thirty-eight words. According to Defendants, such scant language is too incomplete to constitute a stand-alone grant of trackage rights, as Union Pacific suggests.

In light of all of this, the Court finds that Paragraph 7 is in fact ambiguous. It is true that the provision at Paragraph 7 can be fairly understood to mean that upon Gateway Eastern's acquisition of the trackage in question, Southern Pacific could use the trackage for interchange with Conrail or its successors and assigns. But the provision states that the use is "continued," saying nothing about the nature of that use. **Webster's Dictionary** defines "continue" as "to maintain without interruption a condition, course, or action." **WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 284 (1987).** Accordingly, in order to determine the nature of the use contemplated by the parties, the provision clearly requires consideration of parol evidence regarding the parties' intent.

However, Union Pacific supplies nothing beyond the bare language of Paragraph 7 itself to clear up this ambiguity. Absent some additional evidence, the Court is unwilling to accept Union Pacific's bare assertion that Paragraph 7 is a grant of trackage rights without limits on

duration, rights, or responsibilities. Thus, summary judgment may not be granted in Union Pacific's favor, as the ambiguity creates a genuine issue of material fact with respect to the meaning of Paragraph 7.

The Court also notes that Defendants have not moved for summary judgment on any issue other than damages. However, even considering the evidence Defendants present, genuine issues of material fact remain. The parties agree that prior to and at the time of the 1993 Agreement, Southern Pacific's use of the trackage in question was governed by a 1991 Agreement (Doc. 64-3, Exh. 2). Therein, Conrail granted to the St. Louis Southwestern Railway Company (SSW),[5] "rights to operate its trains, locomotives, cars and equipment" over the trackage in question. The 1991 Agreement also included detailed provisions regarding the rights of responsibilities of the parties with respect to the subject trackage, including but not limited to usage, maintenance, management and operation, clearing of wrecks, and liability.

Defendants argue that the "continued use" to which Paragraph 7 refers is that embodied by the 1991 Agreement. To support this position, Defendants supply letters written by Conrail's representatives to Southern Pacific, *see* **Doc. 64-5**, and the 1994 Trackage Rights Agreement between Gateway Eastern and Conrail, wherein Gateway Eastern acquired the trackage in question. *See* **Doc. 54, Exh. 1.** These documents do not resolve the factual dispute, however. Neither Southern Pacific nor Union Pacific was a party to the 1994 Agreement. Additionally, the mere fact that Conrail (which was not a party to the 1993 Agreement) may have sought to ensure Southern Pacific's ability to use the trackage does not alone disprove Union Pacific's contention that

---

[5] SSW was an affiliate of Southern Pacific at that time, and was ultimately merged into Union Pacific (*see* Doc. 53, Exhs. 9 & 10).

the use had already been preserved by the 1993 Agreement. Indeed, Defendants freely admit in their initial response that "a detailed analysis of the negotiations and context of the 1993 Agreement ... is necessary to determine the parties' intent with respect to paragraph 7. The evidence has not been developed, however, to make such an analysis" (Doc. 63).

The Court notes that the parties have each submitted persuasive (but not conclusive) evidence in favor of their separate interpretations of the contract. Accordingly, having construed the evidence in the light most favorable to the non-moving party, the Court finds that a genuine issue of material fact exists with respect to the contract interpretation issue. As a result, the Court must **DENY** Union Pacific's motion for summary judgment on liability (Doc. 53).

## 2. Defendants' Motion for Summary Judgment on Damages

Next, Defendants move this Court to grant summary judgment on the issue of damages (Doc. 82). Defendants argue that even if this Court finds that the contractual language in Paragraph 7 constitutes a grant of trackage rights, Union Pacific cannot show any damages because it never obtained authorization from the Surface Transportation Board (STB). In other words, because Union Pacific has never taken the necessary steps to legally use the trackage, Defendants argue that Union Pacific has incurred no damages.

On the other hand, Union Pacific argues that damages are available because "the only impediment to Plaintiff's use of the Subject Track" is Defendants' assertion that Paragraph 7 is not a grant of trackage rights (Doc. 89, p. 2). Union Pacific claims that because the trackage rights were conveyed in a written agreement, it need only file a notice of exemption in order to satisfy the STB's regulations. According to Union Pacific, exempt transactions are not subject to STB oversight, and the filing process is simply ministerial. Additionally, Union Pacific argues that even

if certain STB action is required, damages are not barred by its failure to file a notice of exemption, because Defendants have wrongfully prevented the contract from taking effect. According to Union Pacific, as long as Defendants refuse to admit that Paragraph 7 currently permits it to use the trackage in question, any STB filing would be pointless without this Court's determination of the interpretation issue.

Assuming *arguendo* that Paragraph 7 does in fact convey trackage rights, the Court notes that federal law generally requires that the STB give approval for the acquisition of such rights. **49 U.S.C. § 11323(a)** provides:

> The following transactions involving rail carriers providing transportation subject to the jurisdiction of the Board under this part may be carried out only with the approval and authorization of the Board:
> . . . .
> (6) Acquisition by a rail carrier of trackage rights over, or joint ownership in or joint use of, a railroad line (and terminals incidental to it) owned or operated by another rail carrier.

However, transactions involving the "[a]cquisition of trackage rights and renewal of trackage rights by a rail carrier over lines owned or operated by any other rail carrier or carriers that are: (I) based on written agreements, and (ii) not filed or sought in responsive applications in rail consolidation proceedings" are exempt from this requirement. **49 C.F.R. § 1180.2(d)(7).** As the alleged contract here was based on a written agreement, it is exempt from the general authorization requirement.

However, **§ 1180.2(d)** also provides that those wishing to claim any such exemption must file a notice of exemption pursuant to the procedures in **§ 1180.4(g). Section 1180.4(g)** provides: "To qualify for an exemption under § 1180.2(d), a railroad must file a verified notice of the transaction with the Board at least 30 days before the transaction is consummated indicating the proposed consummation date."

-13-

Union Pacific and its predecessor have never filed a notice of exemption in the nearly 15 years since the 1993 Agreement was signed.[6] This is so, despite the express requirement of **§ 1180.4(g)** that the notice of exemption must filed 30 days before a trackage rights agreement is "consummated."[7] The Court understands this provision to require the filing of a notice of exemption before the agreement is complete, finalized, or perfected. In other words, the notice of exemption is a prerequisite to consummation.

Nonetheless, Union Pacific believes it can still finalize the alleged 1993 Agreement with respect to the trackage rights by filing a notice of exemption at any time. Union Pacific also claims that the filing of any such notice of exemption is a mere formality, that the process is expedited, and that such exemptions are "routinely granted." ***See Burlington Northern Railroad Co. v. United Trans. Union*, 862 F.2d 1266, 1269–70 (7th Cir. 1988).** But while exemptions may be "routine," even Union Pacific does not go so far as to suggest that they are *always* granted. As the regulation itself indicates, the process is not automatic, as **§ 1180.4(g)** provides deadlines by which other parties may move to stay the petition and indicates that, under certain conditions, the Board may revoke the exemption altogether. ***Id.***

It is clear that an exemption does remove such transactions from the typical STB

---

[6] The Court notes that rarely will such circumstances exist. Generally, when parties in the railroad industry are in the process of completing a written agreement regarding trackage rights, they immediately file for a notice of exemption or otherwise seek the STB's approval. Here, the Court is confronted with an extreme set of facts, where Union Pacific has waited over a decade to take any such action. The belated nature of this course of action is curious, to say the least.

[7] Union Pacific draws the Court's attention to the fact that prior to the 2006 amendments to § 1180.4, the notice of exemption only needed to be filed 7 days prior to consummation. However, this fact is of little consequence given that Union Pacific has *never* attempted to file any such notice of exemption.

filing procedures, and "simplifies and expedites the process for commencing trackage rights operations." *See* **Railroad Consolidation Procedures; Trackage Rights Exemption in 49 C.F.R. Part 1180, 50 F.R. 15751-01, 1985 WL 146750 (Apr. 22, 1985).** But the exemption is not automatic, and the mere filing of the notice is not sufficient in and of itself to give effect to the trackage rights agreement.

Consequently, even if this Court assumes *arguendo* that the 1993 Agreement does include a grant of trackage rights at Paragraph 7, that agreement cannot be put into effect (and Union Pacific cannot legally use the trackage) until the STB grants the exemption or otherwise authorizes the transaction. As a result, it is difficult to see how Union Pacific could have incurred any damages to date.

Additionally, Union Pacific's argument relying on the wrongful prevention doctrine is flimsy at best. The wrongful prevention doctrine provides that "a party who prevents the fulfillment of a condition upon which his own liability rests may not defeat his liability by asserting the failure of the condition he himself has rendered impossible." *Cummings v. Beaton & Associates, Inc.*, **618 N.E.2d 292, 303 (Ill.App.Ct. 1992).** However, there is no indication that Defendants in any way prevented Union Pacific from timely filing a notice of exemption or otherwise pursuing authorization of the alleged trackage rights agreement in the last fifteen years.

Union Pacific argues that Defendants have effectively prevented the performance of the contract, because it is pointless to file a notice of exemption so long as Defendants deny that the 1993 Agreement conveys trackage rights. But this argument is unpersuasive. The agreement was signed on December 20, 1993. **Doc. 53, Exh. 2.** Sometime after the Rose Lake Yard was transferred from Conrail to CSX, Southern Pacific's use of the trackage ceased. **Doc. 64-2, Exh.**

**1, 34:1–20.** It was not until August 2004 that Union Pacific sought renewed use of the track. *See* **Doc. 64-2, Exh. 1, pp. 20–33; Doc. 62-9, Exh. 8.** At that time, Defendants refused Union Pacific's request to use the trackage in question.

Union Pacific provides no indication that prior to 2004 Defendants interfered with or prevented Union Pacific's predecessors from timely filing a notice of exemption. Indeed, a notice of exemption could have been filed at any point after December 20, 1993. The delay in filing is solely attributable to Union Pacific and its predecessors, as it is Plaintiff's own inaction that has left any trackage agreement ineffective. Indeed, the admonition about removing the speck from another person's eye while ignoring the plank in one's own comes to mind.

Moreover, it is not clear why Union Pacific could not have filed a notice of exemption even in the face of Defendants' recent refusal to recognize the agreement as a grant of trackage rights. The STB has repeatedly noted that it will not interject itself into determinations regarding the interpretation of contracts or disputes over contractual terms, and instead will leave such determinations to the courts. *See Brotherhood of Locomotive Engineers v. Chicago & N.W. Trans. Company and Indiana Harbor Belt Railroad Company*, **366 I.C.C. 857, 858 (I.C.C. 1983) (noting that any disagreement about the terms of the trackage rights agreement were not before the I.C.C. and are matters for the courts).** Moreover, as clearly explained in the decisions provided by Union Pacific in its own response, pending contractual disputes do not affect the STB's ability to inquire into exemption petitions. The STB has specifically stated:

> The parties have appropriately taken to court their dispute over the assignability and scope of the trackage rights agreement. **Contractual disputes such as these have no effect on our ability or willingness to grant an exemption.**

**Gateway Eastern Railway Company—Acquisition and Operation Exemption—Lines of Consolidated Rail Corporation, 1995 WL 394470, \*6 (S.T.B. 1995) (emphasis added).** Thus, any STB decision as to the exemption claimed by Union Pacific would not have required the Board to reach a decision as to the validity, terms, or meaning of the 1993 Agreement. As such, there appears to be absolutely no impediment to Union Pacific's filing of a notice of exemption even today. Nonetheless, Union Pacific and its predecessors have chosen not to do so. Therefore, it is clear that Union Pacific can not prove that it has suffered any past damages, as a notice of exemption has yet to be filed and approved.

As no damages have accrued to date, future damages are entirely speculative. Until all necessary steps are taken to give effect to the agreement, if one does indeed exist, there are no damages to be recovered. Of course, if this Court ultimately finds that a contract does exist, and the STB thereafter grants Union Pacific's exemption, damages may be recovered in a separate suit for any breach of contract that may occur thereafter.

Taking all facts and reasonable inferences in the light most favorable to Union Pacific, the Court finds that there is no genuine issue of material fact remaining with respect to damages. Accordingly, Defendants' motion for summary judgment with respect to damages must be granted (Doc. 82).

### D. Remaining Issues

Having granted summary judgment against Union Pacific with respect to damages, the only remaining issues before this Court are Union Pacific's requests for declaratory and injunctive relief. Each of these depend on whether or not the 1993 Agreement conveys trackage rights, a matter that remains in question due to the ambiguity of Paragraph 7.

### E. Conclusion

Construing the evidence and reasonable inferences drawn therefrom in the light most favorable to Defendants, the Court **FINDS** that a genuine issue of material fact exists with respect to contract interpretation and **DENIES** Union Pacific's motion for summary judgment on liability (Doc. 53).

Additionally, having construed the evidence and reasonable inferences drawn therefrom in the light most favorable to Union Pacific, the Court **FINDS** that no genuine issue of material fact remains with respect to damages and **GRANTS** Defendants' motion for summary judgment on damages (Doc. 82).

**IT IS SO ORDERED.**

**DATED this 9th day of September 2008.**

> s/ Michael J. Reagan
> **MICHAEL J. REAGAN**
> **United States District Judge**