**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **UNION PACIFIC RAILROAD COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 07-CV-00320-MJR** |
| | ) | |
| **KANSAS CITY SOUTHERN RAILWAY** | ) | |
| **COMPANY, and GATEWAY EASTERN** | ) | |
| **RAILWAY COMPANY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER FOLLOWING BENCH TRIAL

**REAGAN, District Judge:**

## I. INTRODUCTION AND PROCEDURAL POSTURE

On April 26, 2007, Plaintiff Union Pacific Railroad Company ("UP") filed this action

(Doc. 2) alleging that Defendants Kansas City Southern Railway Company ("KCSR") and

Gateway Eastern Railway Company ("GWER") breached a 1993 Settlement Agreement by

refusing to permit UP to use approximately two miles of railroad trackage between points known

as Q Tower and Willows Tower in East St. Louis, Illinois.  UP's complaint sought damages

incurred from the alleged breach, a declaratory judgment determining that the 1993 Agreement is

binding and remains in effect, and a permanent injunction prohibiting KCSR and GWER from

further preventing UP's use of the trackage.

On September 9, 2008, this Court issued a Memorandum and Order (Doc. 97) in which

the Court denied UP's Motion for Summary Judgment on the issue of liability (Doc. 53).  The

Court found that ambiguity in the language of Paragraph 7 of the December 20, 1993 Agreement

between Plaintiff and Defendants—the contract provision on which this case turns—created a

genuine issue of material fact regarding the meaning of that paragraph and prevented granting UP's motion (Doc. 97, p. 11).

In that same September 9, 2008 Order, this Court granted the Motion for Summary Judgment on Damages (Doc. 82) filed by KCSR and GWER. The Court found that even assuming

> arguendo that the 1993 Agreement does include a grant of trackage rights at Paragraph 7, that agreement cannot be put into effect (and Union Pacific cannot legally use the trackage) until the STB grants the exemption [allowed under 49 C.F.R. § 1180.2(d)] or otherwise authorizes the transaction.

(Doc. 97, p. 15).

Thus, on September 15, 16, and 17, 2008, this matter proceeded to trial to resolve the proper interpretation of Paragraph 7 of the December 20, 1993 Agreement (the "1993 Agreement") and to determine whether Plaintiff is entitled to a declaratory judgment (Count II) or to injunctive relief (Count III) based upon an alleged right to access the railroad trackage at issue.

The Court, having heard the evidence and examined the exhibits, and further having reviewed and considered the entire record in the case, including the Final Pretrial Order ("FPO") dated June 6, 2008 (Doc. 73) and the various pleadings filed by the parties, hereby makes the following findings of fact and conclusions of law pursuant to FEDERAL RULE OF CIVIL PROCEDURE 52.

## II. FINDINGS OF FACT

As a preliminary matter, the Court notes that no evidence was presented in this case from anyone involved in the negotiation or drafting of the 1993 Agreement. Accordingly, in order to interpret Paragraph 7, the Court must look to the language of the 1993 Agreement, the timing and sequence of events surrounding the 1993 Agreement, and the conduct of the parties.

**A.**     **The Parties**

1.        Union Pacific Railroad Company ("UP") is a corporation incorporated under the laws of the State of Delaware.  FPO, Agreed To Issues of Fact, No. 3.

2.        UP's principal place of business is located in Omaha, Nebraska.  FPO, Agreed to Issues of Fact, No. 4.

3.        In 1996, as part of a proposed merger between Southern Pacific Transportation Company ("SP") and UP, SP and UP were placed under common operating control.  FPO, Agreed to Issues of Fact, No. 5.

4.        The Denver and Rio Grande Western Railroad Company ("D&RGW"), St. Louis Southwestern Railway ("SSW"), and SPCSL Corp. ("SPCSL") were all subsidiaries of SP.  FPO, Agreed to Issues of Fact, No. 6.

5.        On June 30, 1997, the D&RGW and SPCSL Corp. were merged into UP.  FPO, Agreed to Issues of Fact, No. 7.

6.        On September 30, 1997, SSW was merged into SSW Merger Corp.  FPO, Agreed to Issues of Fact, No. 8.

7.        Also on September 30, 1997, SSW Merger Corp. was merged into UP.  FPO, Agreed to Issues of Fact, No. 9.

8.        On or about February 1, 1998, UP was merged with and into SP.  FPO, Agreed to Issues of Fact, No. 10.

9.        As of February 1, 1998, the separate corporate existence of UP ceased.  FPO, Agreed to Issues of Fact, No. 11.

10.      SP was the surviving corporation in the merger.  FPO, Agreed to Issues of Fact, No. 12.

11.     As of the day and time of the merger, SP, as the surviving corporation, changed its corporate name to "Union Pacific Railroad Company." FPO, Agreed to Issues of Fact, No. 13.

12.     KCSR is a corporation incorporated under the laws of the State of Missouri. FPO, Agreed to Issues of Fact, No. 14.

13.     KCSR's principal place of business is in Kansas City, Missouri. FPO, Agreed to Issues of Fact, No. 15.

14.     GWER is a corporation incorporated under the laws of the State of Illinois. FPO, Agreed to Issues of Fact, No. 16.

15.     GWER's principal place of business is in Illinois. FPO, Agreed to Issues of Fact, No. 17.

16.     GWER is a wholly-owned subsidiary of KCSR. FPO, Agreed to Issues of Fact, No. 18.

17.     In 2001, Gateway Western Railway Company ("GWWR") was merged into KCSR. Plaintiff's Complaint, Paragraph 6, Defendants' Answer, Paragraph 6.

**B.      The Subject Railroad Track**

18.     The railroad track at issue (hereafter the "Subject Track") is located between "Q" Tower and Willows Tower in East St. Louis, Illinois, running from railroad milepost 238.7+/- to railroad milepost 236.8+/-. FPO, Agreed to Issues of Fact, No. 19.

19.     The Subject Track is a 1.9-mile line of railroad which connects to the Rose Lake Yard on the Illinois side of the St. Louis Gateway. FPO, Agreed to Issues of Fact, No. 20.

**C.      SP's Use of the Subject Track Prior to January 28, 1994**

20.     During the early 1990s, there were three major Class One railroads that operated in the western United States and did business in the St. Louis Gateway area: SP, through SSW; Burlington Northern; and Union Pacific. Batory Depo., p. 72:19-73:18. There were also three major eastern Class One railroads — Norfolk Southern, CSX, and Consolidated

Rail Corporation — that did business in the St. Louis Gateway area but did not operate across either the Merchants Bridge or the MacArthur Bridge into St. Louis, Missouri. Rather, each of the western railroads came across a Mississippi River bridge to effectuate its interchange with the eastern railroads at various locales in the East St. Louis, Illinois area commonly referred to as the St. Louis Gateway. Batory Depo., p. 73:2-18.

21.     One of the eastern railroads with which SP interchanged traffic through the St. Louis Gateway to move traffic to eastern markets was Conrail. Batory Depo., p. 75:8-18. One of the ways that SP had access to Conrail was through use of the Subject Track. Batory Depo., p. 75:19-23; Trial Tr., Vol. I, p. 92:9-14.

22.     SP used the Subject Track to reach Rose Lake Yard where SP interchanged traffic with Conrail. Trial Tr., Vol. II, p. 9:16-20.

23.     In 1991, the Subject Track was owned by Conrail. Tr. Tr. Vol. I, p. 92:9-14.

24.     In 1991, Rose Lake Yard was owned by Conrail. Trial Tr., Vol. III, p. 81:2-7.

25.     In 1991, SP's use of the Subject Track to interchange with Conrail at Rose Lake Yard was governed by an Interchange Agreement dated June 24, 1991, between Conrail and SSW, a subsidiary of SP (the "1991 Interchange Agreement").[1] Plaintiff's Ex. 2, Trial Tr., Vol. I, p. 101:22-102:13.

26.     Under the 1991 Interchange Agreement, Conrail granted SSW Operating Rights (a defined term) over the Subject Track for the purpose of SSW using the track for delivery and receipt of interchange traffic with Conrail at Rose Lake Yard. Plaintiff's Ex. 2, §§ 1 and 2. The Operating Rights were limited to the sole purpose of delivery and receipt of interchange traffic between SSW and Conrail. *Id.*

---

[1] An interchange agreement is essentially an agreement which facilitates delivery of railroad cars from one railroad to a second railroad. Trial Tr., Vol. I, p. 52, ll. 16-23.

27. Under the 1991 Interchange Agreement, there was "no charge for SSW's use of the Subject Trackage as such use is granted for the sole purpose of accessing the Interchange Track(s)." Plaintiff's Ex. 2, § 4.

28. Also under the 1991 Interchange Agreement, Conrail was to maintain, repair, and renew the Subject Trackage at its sole cost and expense, but Conrail did not guarantee the condition of the Subject Trackage or that operation thereover would not be interrupted. Plaintiff's Ex. 2, § 5.

29. The 1991 Interchange Agreement also contained provisions regarding its term and assignability. Under Section 12, the 1991 Interchange Agreement remained in force and effect "until terminated by either party upon thirty (30) days written notice to the other party." Plaintiff's Ex. 2, § 12. The 1991 Interchange Agreement could not be assigned by either party without the prior written consent of the other party. *Id.*, § 13.

**D.** **SP's Physical Use of the Subject Track Prior to and After January 28, 1994**

30. Through the testimony of its witness Jeffrey Grinnell, UP's Director of Joint Facilities, UP admitted that from approximately 1991 until it ceased its use of the Subject Track in 1997, it used the Subject Track to run approximately one intermodal train per week. Trial Tr., Vol. I, p. 131:16-18; Trial Tr., Vol. II, p. 8:17- 9:20.

**E.** **GWWR's Petition for Construction of the "Jug Handle"**

31. Prior to 1992, GWWR entered into a haulage agreement with the Atchison, Topeka, Santa Fe Railroad ("ATSF") where GWWR agreed to move cars for ATSF eastbound from Kansas City into the East St. Louis area. Trial Tr., Vol. I, p. 78:12-79:14.

32. GWWR's delivery of ATSF cars to CSX Transportation, Inc. ("CSX") in the East St. Louis area required GWWR to stop the trains and perform a time consuming "runaround move." Trial Tr., Vol. I, p. 82:3-84:3; Plaintiff's Ex. 12.

33.  To eliminate the need for this time consuming runaround move, GWWR sought to construct a line of railroad called the "Jug Handle" that would create a direct connection in East St. Louis.  Trial Tr., Vol. I, p. 84:7-21; Plaintiff's Ex. 12.

34.  On or about October 13, 1992, GWWR petitioned the Interstate Commerce Commission ("ICC") for approval to construct and operate the Jug Handle.  Plaintiff's Ex. 12.

35.  In support of its petition for ICC approval to construct the Jug Handle, GWWR filed a verified statement by J. Reilly McCarren, GWWR's President.  Plaintiff's Ex. 12.

36.  In his verified statement, McCarren described the time-consuming runaround move GWWR was required to make to interchange with CSX at CSX's Cone Yard.  Plaintiff's Ex. 12.  He also described GWWR's financial position and the operating efficiency that would be gained by allowing the construction of the Jug Handle.  *Id.*

37.  McCarren's verified statement was introduced into evidence by UP to support UP's argument regarding what GWWR may have been willing to bargain for in the 1993 Agreement.  Trial Tr., Vol. I, p. 121:16-20; Trial Tr., Vol. III, p. 17:13-19:4.

38.  On or about October 13, 1992, GWWR also filed a petition with the ICC seeking to have the ICC order the Terminal Railroad Association of St. Louis ("TRRA")[2] and UP's affiliate SPCSL to allow the Jug Handle to cross a track owned by the TRRA and a track owned by the SPCSL.  Plaintiff's Trial Ex. 8.

39.  The TRRA and SPCSL objected to the proposed construction.  Trial Tr., Vol. I, p. 90:21-25.  SP also objected to GWWR's proposed completion of the Jug Handle Track; the installation of the crossover diamond over the Joint Facility Track; and the construction of the connecting track.  Trial Transcript, Vol. I, p. 90:21-25.

---

[2] In 1993, SP had a seat on the Board of Directors of the TRRA.  Trial Tr., Vol. I, p. 114, ll. 10-13.

40.     In addition, on December 30, 1992, SPCSL Corp. filed a lawsuit against GWWR in the United States District Court for the Eastern District of Missouri captioned ***SPCSL Corp. v. Gateway Western Railway Co.***, **Case No. 92-CV-2202**.  The complaint in that action alleged that GWWR had transferred control over GWWR to the ATSF in breach of a Joint Facility Agreement between SPCSL and GWWR providing each party with an undivided one-half interest in the ownership and use of certain rail lines.  Plaintiff's Trial Ex. 7.

41.     As a result of TRRA's and SPCSL's opposition to the construction of the Jug Handle and SPCSL's lawsuit, the construction of the Jug Handle was delayed.  Trial Tr., Vol. I, p. 95:8-96:13.

42.     UP did not provide any testimony regarding the likelihood of success of any of TRRA's or SPCSL's oppositions to GWWR's petitions or of SP's lawsuit against GWWR.

**F.      GWER Negotiates the Purchase of the Subject Track**

43.     On April 30, 1993, GWER and Conrail entered into a Purchase and Sale Agreement wherein Conrail agreed to sell the Subject Track to GWER (the "Purchase and Sale Agreement").  Defendants' Ex. 8; FPO, Agreed to Issues of Fact, No. 21.

44.     The Purchase and Sale Agreement preserved trackage rights for Conrail on the Subject Track.[3]  Defendants' Ex. 8; Trial Tr., Vol. II, p. 178:12-179:25.  This reservation gave

---

[3] In *Illinois Commerce Commission v. I.C.C.,* 819 F.2d 311, 312 (D.C.Cir.1987), the court explained the two types of trackage agreements:

> Trackage rights agreements are arrangements by which one railroad company allows another to use its railroad tracks. These agreements can take one of two different forms. The owner railroad may allow the tenant railroad to serve freight customers along the leased track or may limit the tenant railroad to use of the track from one point to another, withholding permission to serve customers along the route. The ICC refers to the first kind of agreement as "extension trackage rights transactions" and the latter kind as "bridge trackage rights transactions."

*Gateway Eastern Railway Co. v. Terminal Railroad Association of St. Louis,* 35 F.3d 1134, 1137, n.1 (7th Cir. 1994). *See also Simmons v. Interstate Commerce Commission,* 871 F.2d 702, 712 (7th Cir. 1989) ("We have recently

Conrail the right to allow its tenant railroads access over the Subject Track to access Rose Lake Yard. *Id.*

45.     After entering into the Purchase and Sale Agreement with Conrail, GWER filed a request with the ICC on or about June 4, 1993 in which it sought ICC approval for the acquisition of the Subject Track as well as for various other acquisitions and construction projects in the East St. Louis area that would facilitate GWER's operation over the to-be-acquired Subject Track. Trial Tr., Vol. I, p. 93: 5-94:2; Plaintiff's Exs. 9-10.

**G.      After Learning of the Pending Sale, SP Approaches Conrail and GWER Regarding Its Continued Use of the Subject Track**

46.     After learning of the pending sale of the Subject Track to GWER through the public ICC filing, SP expressed concern about its right to continue to use the Subject Track under the 1991 Interchange Agreement. Defendants' Ex. 11.

47.     The general manager for SP's midwestern region, Ron Batory, wrote a letter to Conrail on July 2, 1993 seeking to preserve SP's continued use of the track. The letter stated, in relevant part:

>       We are concerned, first, about SP's right to continue to use the Q Tower – Willows Tower line segment without charge for its run through trains to and from Rose Lake Yard. We would appreciate receiving as soon as possible written substantiation of SP's right to continue using this line segment for that purpose, without charge, if it is acquired by Gateway Eastern.

Defendants' Ex. 11.

---

defined a "trackage rights" agreement as follows: A trackage rights agreement essentially grants rights to a carrier to operate trains over the grantor's track. Such an agreement may limit the use of the track by withholding permission to serve customers along the track, limiting service to specified points on the track or granting unimpaired rights to service points on the track."); *Winter v. Interstate Commerce Commission*, 851 F.2d 1056, 1058, n.4 (8th Cir.), *cert. den.* 488 U.S. 925 (1988) ("There are two basic types of trackage rights agreements. In so-called 'bridge' trackage rights agreements, the owner railroad permits the tenant railroad to use its tracks from one point to another, but withholds permission to serve customers along the route. This allows the tenant carrier to create new routes for long-distance customers. In 'extension' trackage rights agreements, the tenant railroad is allowed to serve freight customers along the line." (citing *Illinois Commerce Commission v. ICC,* 819 F.2d at 312 ).

48. On August 12, 1993, Conrail's general manager, J. R. Beard responded to Batory's request:

> Dear Ron:
>
> This has reference to our recent telephone conversation and your letter of July 2, 1993, concerning the proposed sale of our joint tracks in East St. Louis.
>
> Conrail will protect SP's right to continue to use the Q Tower – Willows Tower line segment without charge for its run-through trains to and from Rose Lake Yard.

Defendants' Ex. 12.

49. On December 20, 1993, SP, GWER, and GWWR executed an agreement (the 1993 Agreement) that resolved various disputes, including the disputes regarding GWWR's construction of the Jug Handle. Defendants' Ex. 14.

50. Reilly McCarren signed the 1993 Agreement on behalf of both GWWR and GWER. Defendants' Ex. 14.

51. As part of the 1993 Agreement, GWER agreed to "permit SP's continued use" of the Subject Track. Defendants' Ex. 14, ¶ 7.

52. Specifically, Paragraph 7 of the 1993 Agreement, the focus of this litigation, provides in its entirety:

> GWER shall permit SP's continued use, without charge to SP, of trackage which GWER will acquire from Conrail between "Q" Tower and Willows Tower for SP interchange with Conrail, any tenant of Conrail and Conrail's successors and assigns.

Defendants' Ex. 14, ¶ 7.

53. At the time the 1993 Agreement (including Paragraph 7) was executed, GWER did not own the Subject Track. *See* Defendants' Exs. 8, 14; FPO, Agreed to Issues of Fact, No. 23.

54.  At the time the 1993 Agreement was executed, Plaintiff's use of the Subject Track was pursuant to the 1991 Agreement as a tenant of Conrail. Trial Tr., Vol. I, p. 130: 18-24.

55.  UP has not presented testimony from any witness who was party to or has any knowledge of the negotiation of the 1993 Agreement.

56.  Though Batory as an SP employee wrote a letter to Conrail concerning SP's continued use of the Subject Track, he had no role in and no knowledge of the actual negotiation of the 1993 Agreement. Batory Depo., p. 47:19-48:17; 71:18-21.

57.  Paragraph 7 was not the only benefit SP received under the 1993 Agreement. For instance, GWWR and SP also guaranteed that their affiliates would have trackage rights over the Joint Facility between Godfrey, Illinois and Church, Illinois to the same extent as GWWR and SP already enjoyed. Defendants' Ex. 14, ¶ 3. GWWR also agreed to SP's construction and subsequent use of certain track in Illinois so as to connect with UP tracks. *Id*. at ¶¶ 5 & 6. Additionally, GWWR promised to place certain track back into service and share construction and maintenance costs with SP upon SP's request. *Id*. at ¶ 8. SP was also granted access to the Continental Grain and Barge Co. facility at Cockrell, Illinois. *Id*. at ¶ 9.

58.  As partial consideration for the 1993 Agreement, SP agreed to withdraw its opposition before the ICC to GWWR's proposed completion of the Jug Handle Track and agreed to allow the GWWR to construct the crossover diamond over the Joint Facility Track. Defendants' Ex. 14, ¶ 11. SP also agreed it would not oppose or seek to delay ICC approval of various filings, including: GWER's purchase of the Subject Track, GWER's regulatory request to operate trains on the Subject Track, or GWER/GWWR's request to construct railroad tracks that would extend from the southern end of the Jug Handle Track to the Subject Track. *Id*. at ¶ 12.

59.  Furthermore, SP agreed that if a formal proposal were submitted to the Board of Directors and management of TRRA to withdraw TRRA's existing opposition to certain transactions pending before the ICC, SP would, as a member of the TRRA Board of Directors, cast its vote in favor of such proposal.  *Id*. at ¶ 13.  SP also agreed it would request voluntary dismissal, with prejudice, of its Petition for Declaratory Order filed with the ICC which alleged that the GWWR violated the Joint Facility Agreement by permitting the ATSF to control GWWR's management and policies.  *Id*. at ¶ 14.  Additionally, SP agreed to request voluntary dismissal, with prejudice, of its Complaint and all requests for relief in the lawsuit captioned ***SPCSL Corp. v. Gateway Western Railway Company*, Case No. 92-CV-2202 (E.D. Mo.).**  *Id*. at ¶ 15.

60.  SP made the filings required of it by paragraphs 11, 12, 13 and 14 of the 1993 Agreement on December 21, 1993 – one day after execution of the Agreement.  ICC Finance Docket No. 32158 (ICC served Nov. 3, 1994).

61.  The dismissal required of SP by Paragraph 15 was received by the court on February 16, 1994 (though marked "filed" on March 22, 1994).  Plaintiff's Ex. 7.

**H.  GWER Finalizes the Purchase of the Subject Track and Executes a Trackage Rights Agreement with Conrail that Permits SP's Use of the Subject Track to Interchange with Conrail**

62.  On January 28, 1994, GWER's purchase of the Subject Track was finalized.  *See* Defendants' Ex. 8; FPO, Agreed to Issues of Fact, No. 23.

63.  Also on January 28, 1994, as part of the larger transaction and as contemplated in Appendix M to the Purchase and Sale Agreement, GWER and Conrail executed what was referred to as the 1994 Trackage Rights Agreement.  Defendants' Ex. 1; FPO, Agreed to Issues of Fact, No. 23.  SP was not a party to the 1994 Trackage Rights Agreement.

64.  The 1994 Trackage Rights Agreement provided Conrail access to the Subject Track as well as a right to "grant other carriers . . . the right to use the trackage rights granted [Conrail] herein" as tenants of Conrail.  Defendants' Ex. 1, § 2(e).

65.  On January 28, 1994, the date the 1994 Trackage Rights Agreement was executed, Conrail, through R.P. Carey, general manager of contracts, sent correspondence to SP confirming that SP's use of the Subject Track could continue pursuant to the 1991 Interchange Agreement.  Defendants' Trial Ex. 2.

66.  Specifically, in his letter to SSW (SP), Carey stated, in pertinent part:

> Please refer to the agreement between Conrail and the St. Louis Southwestern Railway Company ("SSW") dated June 24, 1991 ("Interchange Agreement") . . .
>
> ***
>
> [T]his letter is to advise SSW [SP] that it may continue using the rights provided for by the Interchange Agreement.

See Defendants' Ex. 2.

67.  SP continued to use the Subject Track from January 28, 1994 until January 1997 in the same manner as it had prior to that date.  Trial Tr., Vol. I, p. 131:16-18; Trial Tr., Vol. II, p. 8:17- 9: 20; Trial Tr., Vol. II, p. 15:9-19.

68.  UP did not present any documentary or testimonial evidence that, while SP was using the Subject Track from 1993 to 1997, SP and GWER discussed any other action that was required to effectuate Paragraph 7 of the 1993 Agreement after the execution of the 1994 Trackage Rights Agreement.

69.  After GWER purchased the Subject Track, Plaintiff did not take any steps to obtain approval or an exemption from the Surface Transportation Board for any rights allegedly stemming from Paragraph 7 of the 1993 Agreement.  June 13, 2008 Status Conference

Transcript (Doc. No. 86) at p. 6, ll. 22-25; Sep. 9, 2008 Memorandum and Order (Doc. No. 97) at p. 14.

70.    The 1994 Trackage Rights Agreement contains a restriction on assignment.  Section 19 provides:

> Neither party hereto shall transfer or assign this Agreement, or any of its rights, interests, or obligations hereunder, by merger or otherwise, to any person, firm, or corporation without obtaining the prior written consent of the other party to this Agreement.

Defendants' Ex. 1: 1994 Trackage Rights Agreement § 19.

**I.     SP's Post-January 28, 1994 Use of the Subject Track and Stoppage of Use**

71.    SP's use of the Subject Track went unchanged after execution of the 1994 Trackage Rights Agreement.  SP continued to run approximately one intermodal train per week over the Subject Track to interchange with Contrail at Rose Lake Yard, just as it had prior to December 20, 1993.  Trial Tr., Vol. I, p. 130:25-131:11; Trial Tr., Vol. II, p. 15:9-19.

72.    SP's use of the Subject Track continued unchanged through 1995 and 1996. Trial Tr., Vol. I, p. 131:14-15; Trial Tr., Vol. II, p. 15:9-19.

73.    SP trains operated on the Subject Track until January 1997 when, after the UP/SP merger, SP intermodal operations were folded into Union Pacific's intermodal operations.  Plaintiff's Exhibit 41: Charles Alexander depo., p.16:10-25, p. 17:1-11.

74.    The SP intermodel traffic that had been operating once a week over the Subject Track was transferred for movement on existing daily UP trains out of Dupo, Illinois.  Trial Transcript, Vol. II, p. 112:8-19.

75. UP voluntarily suspended the use of the Subject Track by the former SP intermodal trains in January 1997 for business reasons. Trial Transcript, Vol. I, p. 132:5-16.

76. UP voluntarily suspended its use of the Subject Track before Conrail sold Rose Lake Yard to CSX. Trial Transcript, Vol. II, p. 14:2-17. In other words, UP (SP) suspended its use of the Subject Track approximately 1.5 years before the STB declared that Conrail's right to use the Subject Track was not assignable to CSX. Defendant's Exhibit 3: Excerpts of Conrail Decision No. 89 (by the STB).

**J. CSX Acquires Rose Lake Yard from Conrail**

77. The precise date that CSX Transportation acquired Rose Lake from Conrail is not clear from the record. However, the Court takes judicial notice that CSX obtained authority from the Surface Transportation Board ("STB") to acquire certain assets of Conrail in an STB decision issued July 23, 1998. *CSX Corporation, et al.— Control and Operating Leases/Agreements—Conrail, et al.*, 3 S.T.B. 196, 1998 W.L. 456510 (S.T.B. 1998).

78. CSX appears to have taken over operations of Rose Lake Yard on June 1, 1999. *See* 1999 Trackage Rights Agreement, Defendants' Ex. 7.

79. CSX asked the STB to override the assignment restrictions in the 1994 Trackage Rights Agreement. GWER opposed override of the assignment restrictions of the 1994 Trackage Rights Agreement out of concern about the potential for greater numbers of CSX trains, particularly coal trains, using the Subject Track. The STB expressly refused to override the assignment restrictions in the 1994 Trackage Rights Agreement, holding that there was no basis to allow Conrail to unilaterally assign to CSX its trackage rights (together with Conrail's right to

admit tenants such as SP). *See* Defendant's Exhibit 3: Excerpts of Conrail Decision No. 89 (by the STB).

**K.**   **1997-2004:  SP Does Not Use the Subject Track**

80.   Effective February 1, 1998, UP was merged into SP and SP, as the surviving corporation, changed its corporate name to "Union Pacific Railroad Company." FPO, Agreed to Issues of Fact, No.13.

81.   From the time when SP's use of the Subject Track stopped – sometime in January of 1997 – until 2004, there were to Grinnell's knowledge no requests by SP or UP to access the Subject Track.  Trial Tr., Vol. I, p. 139:1-5.

82.   KCSR's Senior Trainmaster in East St. Louis, Taulton Dancy, testified that shortly after CSX took control of Rose Lake Yard he was instructed by McCarren that Plaintiff no longer had rights to use the Subject Track.  Trial Tr., Vol. III, p. 81:16 – 82:4.

83.   According to Grinnell, starting at an inception date that remains unclear, SP merged its intermodal traffic into UP's existing intermodal operation in the region.  That is, sometime in January 1997, the SP intermodal traffic that had been running once a week over the Subject Track was merged into existing daily UP trains that went south of the St. Louis Gateway area to Dupo, Illinois.  Trial Tr., Vol. II, p. 112:1-14.

84.   Specifically, according to Grinnell, the cargo on the SP trains that had traveled directly across the MacArthur Bridge, over the Subject Track, and into Rose Lake Yard was, after the merger, instead diverted 10 miles to the south to UP's intermodal yard in Dupo, Illinois.  That cargo was then off-loaded, driven by truck back to East St. Louis and into Rose Lake Yard, where it was re-loaded onto

trains.  Trial Tr., Vol. I, pp. 165:3-166:4.  This was referred to by Grinnell as a "rubber tire interchange."  *Id*.  This pattern of operation continued from 1997 until 2004.  *Id.*

**L.**     **UP Seeks Access to the Subject Track for Interchange with CSX**

85.     The new UP/SP entity continued its run to Dupo, Illinois as a means of bringing its intermodal traffic to Rose Lake Yard until, in 2004, UP needed greater and more direct access to Rose Lake Yard.  In the spring of 2004, representatives from UP and CSX met to discuss ways of accommodating increased interchange of coal trains in the St. Louis Gateway area between CSX and UP.  Trial Tr., Vol. II, p. 17:6-18:17; p. 21:11-15.

86.     CSX was making significant capital expenditures in the Rose Lake Yard and wanted to be able to handle additional traffic and interchange with UP.  *Id*.

87.     As a result of these discussions, UP's Director of Joint Facilities, Jeffrey Grinnell, sought means of access to the Subject Track.  Trial Tr., Vol. II, p.18:9-17.

88.     Grinnell had no involvement whatsoever with the Subject Track in the period 1993 through 2002.  Trial Tr., Vol. II, p. 4:12-16.

89.     Grinnell had never been employed by SP (Trial Tr., Vol. II, p. 3:18-20), which operated on the Subject Track under the 1991 Interchange Agreement with Conrail at the time of the 1993 Agreement.  Trial Tr., Vol. I, p. 130:18 - 131:5.

90.     Grinnell had no personal involvement in the negotiations of the 1993 Agreement or the drafting of the agreement.  Trial Tr., Vol. II, p. 5:1-9.

91.     Grinnell had no personal knowledge about who was involved – on either side – in the negotiations of the 1993 Agreement.  Trial Tr., Vol. II, p. 5:4-12.

92.     Grinnell never spoke to anyone directly involved in the drafting or the negotiations of the 1993 Agreement. Trial Tr., Vol. II, p. 47:3-8.

93.     Grinnell's research included the review of a folder in UP's file that contained only three items: (1) the 1991 Interchange Agreement, (2) the 1993 Agreement, and (3) the January 28, 1994 letter from Conrail to SP. Trial Tr., Vol. II, pp. 19:6-20:9.

94.     Grinnell sent an e-mail to his counterpart at CSX, John Booth, on May 3, 2004 concerning Grinnell's findings about UP's or CSX's rights to use the Subject Track. Trial Tr., Vol. I, pp. 159:17-160:22; Defendants' Ex. 6.

95.     The e-mail attached the January 28, 1994 letter from Conrail to SP stating that Conrail had preserved SP's (UP's) continued right to use the Subject Track. Defendants' Ex. 6.

96.     Grinnell's e-mail to Booth continued:

> This [January 28, 1994] letter references a separate agreement between GWE and CR that provides for SSW's use of the line as a tenant of Conrails. If that is the case, it would be fair to assume that CR (now CSX) could use the line under it's [sic] own rights. HOWEVER, IF CSX CAN IN FACT USE THE LINE FOR INTERCHANGE WITH UP CAN ONLY BE DETERMINED BY INTERPRETATION OF THE CONTRACT MENTIONED IN THE LETTER. John at CSX will have to do that. In a December 20, 1993 settlement agreement between GWER/GWWR and Southern Pacific on a broad range of topics SP's right to use the GWER's track between Q and Willows for interchange with CR was affirmed, but it made no mention of assignability. To my knowledge a stand alone Trackage Rights agreement with the GWER for this track was never executed.

> *Id*. (emphasis in original).

97.     Grinnell testified that he anticipated the usage of the Subject Track in 2004 by the now-combined UP/SP entity would increase from one train per week to as many as 5 trains per day. Trial Tr., Vol. II, p. 20:10-17.

98.   Grinnell estimated conservatively that UP's desired use of the Subject Track would be a 20- to 21-fold increase over SP's prior usage. Trial Tr., Vol. II, p. 21:6-9.

99.   The heavier coal traffic proposed by the UP/CSX commerce (as opposed to intermodal traffic) would cause additional wear and tear on the Subject Track. Trial Tr., Vol. II, pp. 21:10-15; 117:2-16 (testimony of J. Grinnell).

**M.    UP Seeks Access to the Subject Track from KCSR**

100.  On August 11, 2004, Grinnell wrote an e-mail to KCSR's in-house attorney, Thomas J. Healey, with a copy to KCSR's Corporate Designee, Douglas Banks, asserting that UP has a right to use the Subject Track. Defendants' Ex. 4.

101.  Grinnell attached two documents to the e-mail: the January 28, 1994 letter from Conrail to SP and the 1993 Agreement. *Id.*

102.  Grinnell added about the 1993 Agreement: "Section 7 of that agreement permits UP's continued use of the track between Q and Willows for interchange with the CSX (former CR)." *Id.*

103.  In response, Banks left Grinnell a telephone message referring him to STB Decision No. 89 declining to override the assignment restrictions of the 1994 Trackage Rights Agreement. Trial Tr., Vol. II, p. 29:19-30:4.

104.  Grinnell responded with an e-mail to Banks on September 7, 2004 stating:

      Thanks for your message of what to search for in the STB decision of the CSX – CR purchase (Decision No. 89). If I understand KCS's position correctly, UP's rights on the GWER was as a tenant of CR and that when those rights couldn't be assigned from CR to CSX, UP's rights terminated.

      Defendants' Ex. 18.

105. Grinnell asserted that the STB decision did not, however, affect the rights UP

acquired under the 1993 Agreement. Rather, he said in that e-mail:

> The Q Tower Settlement is an independent grant of rights from Gateway (KCS) to SP, and it's not contingent on the existence of the CR trackage rights agreement.

> *Id.*

106. Banks wrote back, specifically requesting a copy of the 1991 Interchange

Agreement between SSW and Conrail. In response, Grinnell wrote on September

10, 2004:

> As our discussion of this has moved forward it is clear that the grant of rights in the 1993 Q Tower settlement is an independent grant of rights, separate and apart from the 1991 SP-CR Interchange Agreement or the CR rights that didn't transfer to CSX. In my earlier conversation with Tom, I was unaware that those CR rights referred to in the 1994 letter to Bill Fowler (which you have a copy of) did not transfer to CSX. At this point, the 1991 Agreement between SP and CR is not materially relevant.

> *Id.*

107. In response, Banks wrote to Grinnell on September 13, 2004, stating in relevant

part:

> Section 7 of the 1993 Agreement does not constitute an independent grant of rights. Section 7 is merely an affirmation of Gateway Eastern's willingness to recognize "SP's continued use" of trackage which Gateway Eastern was in the process of acquiring from Conrail at the time. The key phrase in this section is "permit continued use". Had this section used terms such as "grant", "give", "convey" or a similar term, one might be able to make an argument that this was, in fact an independent grant of rights. "Permit continued use" clearly has as its basis on a preexisting right granted in a preexisting agreement between SP (or its predecessor SSW) and Conrail presumably the 1991 SP-CR Interchange Agreement (the "Interchange Agreement").

> Plaintiff's Ex. 19.

## N. The Ensuing Litigation

108. On April 26, 2007, Plaintiff filed its Complaint alleging that it has been

wrongfully denied the right to operate over the Subject Track and demanding that

Defendants have the "obligation to allow Union Pacific Railroad Company to use the trackage between Q Tower and Willows Tower . . . and that such use by Union Pacific Railroad Company shall continue, and be without charge to Union Pacific Railroad Company." (Doc. No. 2 at paragraph 27).

109. UP further explained its interpretation of the meaning of the 1993 Agreement in Plaintiff's Memorandum in Support of its Motion for Summary Judgment:

> Nowhere in the 1993 Agreement does it indicate that SP's rights to use the Subject Track pursuant to Paragraph 7 would be subject to any other agreement or any other grant of rights. [Reference omitted.] Instead, Paragraph 7 is a clear, unambiguous, *independent* grant of rights: SP is given a direct grant of usage rights over the Subject Track *by* GWER.

> Doc. No. 54, pp. 8-9 (emphasis in original).

110. In advance of the original trial setting of this matter, Defendants submitted a trial brief asserting that if Plaintiff is alleging Paragraph 7 is an independent grant of rights, then Plaintiff must comply with the Surface Transportation Board ("STB") authorization requirements before it could be in a position to exercise those rights. ( Doc. No. 73).

111. In response, Plaintiff acknowledged the STB authorization requirements of a trackage rights agreement. "I would concede, Your Honor, that if the Court should rule in our favor [on Plaintiff's Motion for Summary Judgment on Liability] that my next step is to file a Notice of Exemption under 49 CFR 1180.2, subsection (d)(7) based on a written contract to operate over the track." *See* transcript of status conference dated June 13, 2008, recorded as Doc. No. 86.

112. By order of the Court, the parties thereafter submitted briefing pertaining to the impact of STB authorization requirements. In the Court's Order of Summary Judgment issued on September 9, 2008, the Court determined that STB authorization was a prerequisite to use of the track. Accordingly, the Court found that even if there were a valid contract

allowing UP to use the Subject Track, UP could not prove that it suffered damages because it failed to seek the necessary STB authorization for the trackage rights it claims. Doc. No. 97 at page 17. "Until all necessary steps are taken to give effect to the agreement, if one does indeed exist, there are no damages to be recovered." *Id.*

## O. Trackage Rights Agreements Contain Typical and Customary Features

113. Customarily in the railroad industry, trackage rights agreements (agreements by which one railroad allows its track to be used by another for purposes other than interchange between the two[4]) contain specifications as to the terms and volume of use, terms of assignability, terms for repair, maintenance and renewal, terms for access fees, terms for traffic flow, terms for impact on other railroads, terms for liability, and terms for termination. Trial Tr., Vol. II, pp. 95:19-101:5; 107:15-109:11.

114. Grinnell himself has executed a number of trackage rights agreements, including trackage rights agreements with Defendants, containing such terms. Trial Tr., Vol. II, p. 104:10-20; Defendants' Ex. 26.

115. Grinnell on behalf of UP acknowledged that, in his experience, these are customary and typical terms found in modern trackage rights agreements. Trial Tr., Vol. II, pp. 95:19-101:5; 107:15-109:11.

116. Douglas Banks testified that he did not believe that Paragraph 7 of the 1993 Agreement constituted an independent grant of trackage rights, but he agreed that, assuming *arguendo* that it did, then Paragraph 7 would have to be submitted to

---

[4] *See generally Indiana Rail Company-Exemption-Acquisition and Operation*, Finance Docket No. 30789, 1987 WL 98241 (I.C.C. decided April 7, 1987) ("the transaction does not encompass trackage rights. IRRC enters onto ICG track <u>solely</u> for interchange and not for its own account….").

the STB for approval or exemption pursuant to the above-cited provisions.  Trial Tr. Vol. III, p. 67:20-68:5.

117.    Each of the trackage rights agreements signed by Grinnell that were admitted into evidence at trial contained the types of customary and typical terms referenced above.  Defendants' Ex. 26; Trial Tr., Vol. II, pp. 95:19-101:5; 107:15-109:11.

## III.  CONCLUSIONS OF LAW

### A.    Jurisdiction and Venue

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 in that Plaintiff and Defendants are citizens of different states[5] and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00.   FPO, Agreed To Issues of Fact, No. 1 (Doc. 73).  Venue is proper pursuant to 28 U.S.C. § 1391(a) because the railroad track at issue is located within this Judicial District.  FPO, Agreed To Issues of Fact, No. 2.

### B.    Choice Of Law

2.    The 1993 Agreement includes a choice of law provision.  Paragraph 18 of the 1993 Agreement states that the "Agreement is made under and shall be applied and interpreted in accordance with the laws of the State of Illinois."  Plaintiff's Ex. 6, ¶18.  Moreover, as a federal court in Illinois exercising diversity jurisdiction, the Court applies federal law in resolving procedural and evidentiary issues, and Illinois law with respect to substantive law.  ***Bevolo v. Carter*, 447 F.3d 979, 982 (7th Cir. 2006) (citing *Colip v. Clare*, 26 F.3d 712, 714 (7th Cir. 1994)).**  Accordingly, Illinois law governs the issues of contract interpretation before the Court.

---

[5]    UP is a Delaware Corporation with its principal place of business in Nebraska.  KCSR is a Missouri corporation with its principal place of business in Missouri.  GWER is an Illinois corporation with its principal place of business in Illinois.

## C.   Illinois Rule Regarding Contract Interpretation

3.      "Illinois adheres to a 'four corners rule' of contract interpretation." ***Davis v. G.N. Mortgage Corp.***, **396 F.3d 869, 878 (7th Cir. 2005).**  Under the four corners rule, "extrinsic or parol evidence concerning a prior or contemporaneous agreement is not admissible to vary or contradict *a fully integrated writing.*"   ***Id***. **(emphasis in original).**  However, if there is ambiguity in the agreement, extrinsic evidence is admissible to resolve that ambiguity regardless of whether the contract is fully integrated.  Thus, "even when a contract is integrated on its face, if the contract is ambiguous, as a matter of law, then extrinsic and parol evidence is admissible to explain the terms of the ambiguous contract." ***Id.*** **(quoting *Sunstream Jet Express, Inc. v. Int'l Air Serv. Co., Ltd.*, 734 F.2d 1258, 1265 (7th Cir. 1984)).**

4.      The interpretation of a contract where no ambiguity exists is a matter of law for the Court to decide.  ***Air Safety, Inc. v. Teacher's Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999).**  However, if the contractual language "is susceptible to more than one meaning, then an ambiguity is present . . . [and] parol evidence [may] be admitted to aid the trier of fact in resolving the ambiguity." ***Id.*** **(citations omitted).**

5.      Under Illinois law, language in a contract is ambiguous if it is unclear or susceptible to more than one meaning.  ***Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007).**

6.      In contract interpretation, "a court's principal goal . . . is to ascertain and give effect to the parties' intent at the time they entered into the contact." ***Meyer v. Marilyn Miglin, Inc.*, 652 N.E.2d 1233, 1237 (Ill. App. Ct. 1995).**  Furthermore, "[i]n construing contracts, to determine their intent, it is long established law that a construction should be adopted, if possible, which ascribes meaning to every clause, phrase and word used; which requires nothing to be rejected as meaningless, or surplusage; which avoids the necessity of supplying any word or phrase that is not expressed; and which harmonizes all the various parts so that no provision is

deemed conflicting with, or repugnant to, or neutralizing of any other." ***Coney v. Rockford Life Ins. Co.*, 214 N.E.2d 1, 3 (Ill. App. Ct. 1966).**

7.      Paragraph 7 of the 1993 Agreement provides:

> GWER shall permit SP's continued use, without charge to SP, of trackage which GWER will acquire from Conrail between "Q" Tower and Willows Tower for SP interchange with Conrail, any tenant of Conrail, and Conrail's successors and assigns.

Defendants' Ex. 14, ¶ 7.

8.      In its September 9, 2009 Order, the Court expressly found that Paragraph 7 is ambiguous, specifically with regard to the words "continued use" (Doc. 97, p. 10). That determination led the Court to deny UP's motion for summary judgment and proceed to trial so as to consider extrinsic evidence that might help clarify the parties' intent at the time of the 1993 Agreement.

9.      In examining the evidence offered to resolve this ambiguity, this Court is mindful that the burden of proof remains with the Plaintiff. In an action to enforce a contract, the plaintiff shoulders the burden of proof of every material term of the contract. ***See Jaffe Comm. Fin. Co. v. Harris*, 456 N.E.2d 224, 229 (Ill App. Ct. 1983).** When the issue before a court is resolution of an ambiguity in a contract, the burden remains with the plaintiff to prove the meaning of the ambiguous language. ***Prairie Land Const., Inc. v. Village of Modesto*, 571 N.E.2d 1210, 1214 (Ill. App. Ct. 1991) (the plaintiff failed to carry its burden of presenting evidence to shed light on the meaning of an ambiguous term of the parties' contract).**

11.      The Court looks both to the language of Paragraph 7 and to the parties' conduct in order to decipher their intent at the time of the 1993 Agreement. In doing so, the Court notes that the parties have not provided testimony from anyone who was involved in the negotiation or drafting of the 1993 Agreement.

**D.**     **The Effect of the 1994 Trackage Rights Agreement**

12.     First, the Court considers the Defendants' argument that GWER's conduct surrounding the 1994 Trackage Rights Agreement with Conrail, along with the nature of SP's subsequent use of the track, proves that Defendants fully complied with Paragraph 7.  The Court disagrees.  It is true that the 1994 Trackage Rights Agreement did preserve Contrail's right to allow its tenants to use the Subject Track for purposes of interchanging with Conrail.  As a practical matter, this ensured that SP could use the track to interchange with Conrail under the terms of the 1991 Interchange Agreement.  But the 1994 Trackage Rights Agreement did not preserve SP's right to interchange with Conrail's successors and assigns because it was non-assignable without the consent of both Conrail and GWER.  In fact, when CSX purchased Conrail's assets, CSX sought to override this assignability provision so that Conrail's tenants, such as SP, could continue using the trackage.  GWER refused to consent and opposed assignment of the 1994 Trackage Rights Agreement.  Such conduct on Defendants' part clearly does not comply with the language in Paragraph 7, which permitted "SP's continued use" of the Subject Track for interchange not only with Conrail, but also with Conrail's successors and assigns.  Defendants' Exh. 14, ¶ 7.  Insofar as the 1994 Trackage Rights Agreement failed to permit SP's interchange with Conrail's successors, it cannot be deemed as full compliance with Defendants' obligations under Paragraph 7.

13.     Moreover, SP was not a party to the 1994 Trackage Rights Agreement, and thus could not have sought enforcement of that Agreement if necessary.  Whatever agreement GWER made with Conrail to ensure SP's rights to use the Subject Track is immaterial to GWER's own separate commitment directly to SP in Paragraph 7 of the 1993 Agreement.  The Court also notes that it is entirely logical that SP would seek permission to use the Subject Track from the track's

soon-to-be owner (GWER) rather than merely relying on the prior owner (Conrail) to preserve SP's use of the track as part of the sale.

14.     On the other hand, it must be recognized that execution of the 1994 Trackage Rights Agreement may constitute partial compliance with GWER's obligations under Paragraph 7 of the 1993 Agreement.  In other words, it is plausible that GWER gave partial effect to Paragraph 7 by including a provision in the 1994 Trackage Rights Agreement through which SP could use the Subject Track to interchange with Conrail.  Indeed, there is no question that SP enjoyed uninterrupted use of the track from 1994 through January 1997.

15.     Additionally, at the time the 1994 Trackage Rights Agreement was being negotiated, SP specifically requested that Conrail ensure its continued use of the Subject Track. On January 28, 1994, after the sale of the Subject Track was completed, R.P. Carey of Conrail wrote to W.E. Fowler of SP and confirmed that Conrail had, in the closing of the GWER-Conrail transaction, protected SP's rights, as requested by SP.  *See* Findings of Fact 66 ("[T]his letter is to advise SSW [SP's subsidiary] that it may continue using the rights provided for by the Interchange Agreement").  Thus, SP could not have been ignorant of the fact that GWER had, at least for the time being, taken steps that ensured SP's use of the Subject Track.

**E.     SP's Failure to Obtain ICC or STB Approval in 1993**

16.     Still, it is difficult to view Paragraph 7 as a broad grant of trackage rights, whereby SP was permitted to use the Subject Track without limitation, restriction, or expiration. Assuming *arguendo* that the parties did intend that Paragraph 7 constitute an independent grant of trackage rights, federal law generally requires that the STB give approval for the acquisition of such rights.  **49 U.S.C. §11323(a).**  Transactions involving the "[a]cquisition of trackage rights and renewal of trackage rights by a rail carrier over lines owned or operated by any other rail carrier or carriers that are: (i) based on written agreements, and (ii) not filed or sought in

27

responsive applications in rail consolidation proceedings" are exempt from this requirement." **49 C.F.R. §1180.2(d)(7).**  As the alleged contract was based on a written agreement, it would be exempt from the general authorization requirement.  However **§1180.2(d)** also provides that those wishing to claim any such exemption must file a notice of exemption pursuant to the procedures in **§1180.4(g).**  To qualify for the exemption, the railroad must "file a verified notice of the transaction with the Board at least 30 days before the transaction is consummated indicating the proposed consummation date." **49 C.F.R. §1180.4(g).**

17.     Defendants' witness, Douglas Banks, made it clear that he did not believe that Paragraph 7 constituted an independent grant of trackage rights.  However, he agreed with the Court's view that, assuming *arguendo* that Paragraph 7 was an independent grant of trackage rights, then Paragraph 7 would have to be submitted to the STB for approval or exemption pursuant to the above-cited provisions.[6]  Trial Tr. Vol. III, p. 67: 20 to 68: 5, Testimony of D. Banks.

18.     It is undisputed that SP, and later UP, never sought approval or exemption from the ICC or its successor agency, the STB, for the rights it now claims were so important to its franchise. *See* Trial Tr. Vol. III, p. 54, ll. 6-11, Testimony of Grinnell.  Even though UP claims the asserted rights were "very important" to its franchise, it never sought STB exemption despite the fact that obtaining such an approval or exemption would have safeguarded against the danger of revocation or lapse of the rights on contractual grounds absent STB authorization. ***See, e.g., Thompson v. Texas Mexican Railway Company*, 328 U.S. 134, 145 (1946) (holding that even if a trackage rights agreement had expired, authority from the I.C.C. to abandon the**

---

[6]  The Court does not recall specific testimony regarding this issue from Plaintiff's witnesses.  However, Plaintiff's counsel has admitted before this Court that in the event that Paragraph 7 is deemed to constitute a grant of trackage rights, Plaintiff's next step will be to seek the exemption before the STB.  See Finding of Fact 111.

**trackage rights operation was nevertheless required before that operation could legally be discontinued).**

19.    If SP, and later UP, had actually believed that Paragraph 7 constituted an independent, stand-alone grant of trackage rights, it is fair to assume that either would have taken the steps to obtain proper regulatory approval or an exemption to use them.  Their failure to do so over a 15-year period gives rise to a strong inference that they did not believe Paragraph 7 constituted a grant of trackage rights.

**F.    The Structure of Paragraph 7 Itself**

20.    At trial, the Court also heard testimony from the witnesses regarding industry custom and usage concerning the content of trackage rights agreements.  Paragraph 7 contains only 38 words and has virtually none of the terms that typical trackage rights agreements contain, such as terms of use, assignability, repair and maintenance of the trackage, access, traffic flow and frequency of use, wreckage clearage, liability for track and land damage,[7] duration, and termination.  Even UP's witness, Grinnell, admitted that these are customary provisions in trackage rights agreements, after reviewing a number of them executed by his own employer, UP.  The vacuous nature of Paragraph 7, with its lack of any of the usual and customary terms of a trackage rights agreement, strongly suggests that the parties did not thereby intend to convey independent trackage rights.

21.    The Court also notes that the language of the 1993 Agreement as a whole does not support interpreting Paragraph 7 as an outright grant of trackage rights.  The term "permit continued use" appears only once—in Paragraph 7.  By contrast, other paragraphs in the agreement show that when the parties intended to confer new rights, they used the term "grant."  *See* Plaintiff's Ex. 6, ¶ 3 (GWWR granting trackage rights to SP between Godfrey and Church,

---

[7]  Douglas Banks testified that he had never seen a trackage rights agreement that lacked a liability clause.

Illinois); ¶ 9 (GWWR granting SP commercial access over trackage to the CGB facility at Cockrell, Illinois). The use of the term "permit continued use" as opposed to "grant" plainly shows that the parties did not intend to grant or convey something new or different from what existed before; rather, intending only to permit an existing use to continue under its existing terms. *See Taracorp, Inc. v. NL Industries, Inc.*, **73 F.3d 738, 744 (7th Cir. 1996) ("when parties to the same contract use different language to address parallel issues (i.e., indemnification obligations regarding two different facilities), it is reasonable to infer that they intend this language to mean different things.").** If the parties had intended for Paragraph 7 to create new, independent trackage rights, they would have used the term "grant" as they did in Paragraphs 3 and 9. Their failure to do so supports the conclusion that "continued use" referred back to SP's prior actual use.

## G.   Consideration Given by SP under the 1993 Agreement

22.     Plaintiff also argues that its reading of Paragraph 7 is justified by the fact that SP gave up valuable consideration in the 1993 Settlement Agreement. For instance, Grinnell discussed GWWR's petition to construct and operate the Jug Handle, so as to facilitate GWWR's haulage of ATSF cars into the East St. Louis area, and how SP initially opposed the Petition. Grinnell also discussed GWWR's Petition before the ICC seeking to require the TRRA and SPCSL to allow the Jug Handle to cross tracks owned by them, and their opposition to it. Grinnell further testified about a breach of contract lawsuit that SPCSL filed against GWWR in late 1992, claiming that GWWR breached a Joint Facility Agreement by essentially transferring control of GWWR to ATSF. Grinnell noted that those resolutions benefited GWWR.

23.     The apparent intent of this presentation was to convince the Court that GWWR and, by proxy, GWER, were willing to trade limitless and perpetual use of the Subject Track to resolve these disputes and allow the Jug Handle to be built. Plaintiff also suggests that SP would

not have given up this substantial consideration unless Paragraph 7 was meant to be interpreted in this way.

24. However the Court is not convinced that Paragraph 7 has to be read so broadly in order to justify the consideration given up by each party. First, while GWWR and GWER benefited from the resolution of these disputes in the 1993 Agreement, SPCSL and SP benefited from many of the other provisions in the 1993 Agreement—not just Paragraph 7. Plaintiff's counsel conceded this fact in his opening statement. Trial Tr., Vol. I, p. 17:11-22.

25. Additionally, UP has failed to provide any evidence as to the strength or merits of SPCSL's opposition to the construction of the Jug Handle or its lawsuit alleging breach of the Joint Facility Agreement. To be sure, that opposition delayed the construction projects sought by GWWR and GWER. But there was nothing to indicate that the delay would become so impassable that Defendants would have been willing to give SP virtually unlimited use of the Subject Track.

**H.**     **The Nature of SP's Use of the Subject Track**

26. With these factual considerations in mind, the Court shall now squarely address the principal question: what did the parties intend when Defendants agreed to "permit SP's continued use" of the Subject Track? The proper interpretation of Paragraph 7 depends entirely on the nature of the "continued use" in question. **Webster's Dictionary** defines "continue" as "to maintain without interruption a condition, course, or action." **WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 284 (1987).** In other words, the use to which the parties referred was an ongoing use that they agreed would not be interrupted by the sale of the Subject Track.

27. Plaintiff's own evidence at trial was that the actual use that SP made of the Subject Track prior to the execution of the 1993 Agreement was limited to one intermodal train per week. Additionally, the rights and responsibilities of SP regarding its use of the track were

governed by the terms in the 1991 Interchange Agreement. Obviously, this was the only "continued use" that the parties could have had in mind when they drafted Paragraph 7. Though the parties did not expressly incorporate the 1991 Interchange Agreement into Paragraph 7, their clear expectation was that SP would continue using the track the same way it had before the 1993 Agreement was finalized. This understanding includes both the actual use (i.e., approximately one intermodal train each week) and all corresponding responsibilities pertaining to that use as provided by the 1991 Interchange Agreement. The only apparent difference was that the right to use the track was now being granted by GWER rather than Conrail.

28. This conclusion is further compelled by the fact that SP ran only one intermodal train per week on the Subject Track even after GWER officially acquired the Subject Track. Plaintiff's evidence establishes that the nature of SP's use under the 1993 Agreement through January 1997 did not deviate from SP's use of the Subject Track prior to that agreement.

29. Plaintiff has argued that Paragraph 7 gives it unrestricted use of the Subject Track, which means that Plaintiff could, under its interpretation, essentially convert the Subject Track to its own through constant use. In fact, Grinnell testified that Plaintiff now seeks to run five trains a day into Rose Lake Yard. Trial Tr. Vol. II, p. 20:10-22. Later, Grinnell retrenched and said only 21 trains a week. Trial Tr. Vol. II, p. 21:1-9. Regardless, Plaintiff's position that such an extensive use of the track is encompassed by Paragraph 7's reference to a "continued use" is obviously untenable in light of both SP's use of the track at the time of the 1993 Agreement along with its use thereafter. Plaintiff offered no evidence that could lead the Court to conclude that unlimited use could be considered a "continuation" of the prior undisputed use of one intermodal train per week.

30. But "continued use" does not only refer to SP's use before the 1993 Agreement. The word "continued" also contains a requirement that the use be ongoing. In other words,

Paragraph 7 only obligated GWER to permit SP's use, so long as SP actually continued to use the track in the manner permitted. In order for SP's use to be a "continued use," SP had to use the Subject Track with consistent regularity.

31.     Once a particular use is abandoned, however, it can no longer be regarded as a "continued use." Plaintiff admits that in January 1997, it voluntarily stopped using the Subject Track. Plaintiff also admits that neither SP or UP attempted to use the Subject Track again until 2004. In light of this fact, the Court is compelled to find that Plaintiff discontinued its use of the Subject Track, such that GWER is no longer obligated to permit Plaintiff's use under Paragraph 7. A seven year cessation does not constitute a "continued use" but rather a discontinuation of Plaintiff's use of the Subject Track.

32.     This interpretation of the contract is compelled not only by the use of the word "continued," but also by the parties' conduct soon after SP/UP stopped using the track. Within two years of SP/UP's decision to use an alternate route, Conrail transferred Rose Lake Yard to CSX. By that point, it was apparent that SP/UP was not using the track. Taulton Dancy testified that at some point during 1998 or 1999, Reilly McCarren instructed Dancy, the trainmaster in East St. Louis, that Plaintiff no longer had rights to use the Subject Track. This was the same McCarren who was the signatory for Defendants for the 1993 Agreement. McCarren's conduct demonstrates that he, as the signer of the 1993 Agreement, believed that whatever rights were conferred upon SP had expired at that time.

33.     Furthermore, the Court's interpretation of the phrase "continued use" is logical in light of the Defendants' arguments regarding the need to control the amount of traffic on the Subject Track. As a practical matter, if UP is able to employ intermittent and substantial increases train traffic based upon its whim, the track may become overloaded and debilitate other railroad operations. It makes sense, then, that the parties to the 1993 Agreement would have

preserved SP's use only so long as SP consistently used the Subject Track. Such an arrangement allows GWER to avoid sudden and unexpected traffic congestion. It would create havoc if SP were permitted to arbitrarily stop its usage of the track for months (or years) at a time, only to suddenly re-engage at a later date. On the other hand, if SP's use of the track remained consistent and limited to one train a day, operations on the track could remain efficient and on schedule.

34.     The Court notes that precluding UP from operating on the Subject Track does not impede its ability to move its trains through the region. The use of alternate routes is admittedly slower and more costly than using the Subject Track. But as of the trial date, UP was running its trains on a separate track into Rose Lake Yard via an agreement with CSX. Additionally, UP can use the MacArthur Bridge or Merchants Bridge, both of which span the Mississippi River, albeit at the cost of $2,000 per train or $114 per car, respectively.

35.     To summarize, the Court interprets the phrase "continued use" as referring to both (a) the nature and frequency of SP's use of the Subject Track at the time of the 1993 Agreement and (b) a consistent and ongoing use without prolonged cessation. Specifically, Paragraph 7 required GWER to permit SP/UP to run approximately one intermodal train per week on the Subject Track for purposes of interchange with Conrail, its successors, and assigns, so long as SP/UP did so on a regular basis and did not discontinue its use of the Subject Track.

36.     The use UP now seeks to employ is beyond the scope of the use permitted by the 1993 Agreement. Additionally, SP/UP discontinued its use of the Subject Track in 1997, such that any use of the track can no longer be considered a "continued use" under the Agreement. Accordingly, the Court must find against the Plaintiff.

## IV.  FINAL ORDER

For all of the reasons explained above, the Court hereby **FINDS** that the 1993 Agreement does not permit UP to operate its trains on the Subject Track.  As a result, the Court **DIRECTS** the Clerk of the Court to **ENTER JUDGMENT** in favor of Defendants and against Plaintiff. This case is now closed.

**IT IS SO ORDERED**

**DATED this 12th day of August 2009.**

<u>**s/ Michael J. Reagan**</u>
**MICHAEL J. REAGAN**
**United States District Court Judge**